J-S16032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| HOPE BROWN AND M.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JUSTIN M. ROBINSON | : | No. 1412 MDA 2024 |

Appeal from the Order Entered September 4, 2024
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-24-03046

BEFORE:    LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: JULY 22, 2025**

Hope Brown ("Mother") and her child, M.R. (the "Child"), a minor, take this counseled appeal from the order dismissing their petition for a final Protection From Abuse[1] ("PFA") order against Justin M. Robinson ("Father"). We affirm.

At the time of the underlying order, Child was eleven years old.  Father is the Child's father.  He and Mother are divorced, and Father had primary physical custody of the Child pursuant to a December 15, 2022 custody order. Their "custody action has a long and contentious history[.]"  Trial Court Opinion, 11/22/24, at 1 n.1.  The trial court ably summarized the underlying facts and procedural posture of this case.  **See** Trial Court Opinion, 11/22/24,

_____

[1] **See** 23 Pa.C.S.A. §§ 6101-6122 (Protection from Abuse Act ("PFA Act")).

at 1-12. We need not reproduce a detailed discussion of it here, but summarize the following:

On April 26, 2024, Mother [and Child[2]] filed a petition for an emergency protective order[,] alleging that the Child had met with a representative of the Lancaster County Children and Youth Services Agency [("CYS")] the day before[.] Father somehow learned of the plan and became angry. A magisterial district justice entered an *ex parte* emergency PFA order[,] which prohibited Father from contacting Mother or the Child.

*Id*. at 1-2.[3]

Three days later, on April 29, 2024, Mother filed a PFA petition, premised on the following allegations: (1) on April 24, Father "struck the Child in the face with both an open hand and a closed fist;" (2) on April 25, Father yelled at and threatened the Child "because he was angry about an investigation by CYS; and (3) on previous occasions, Father struck and threatened the Child, "and threaten[ed] to "burn [their] house down and kill [them]." *Id*. at 2. We note that on April 25, 2024, East Hempfield Police Officer Paul Solari ("Officer Solari") conducted a welfare check on the Child. Following an *ex parte* hearing, "a temporary protective order was entered[,] which granted Mother temporary legal and physical custody of the Child." *Id*.

---

[2] Although the petition for a final PFA order listed both Mother and the Child, for ease of discussion, we refer to the petition as filed by Mother only.

[3] For further ease of discussion, we have amended the trial court opinion's references to "the child" to "the Child."

The trial court scheduled, but continued several times, a hearing for Mother's PFA petition. We note Mother had also filed a contempt petition against Father in their custody case. The trial court scheduled the proceedings for these matters together.[4] *See* Trial Court Opinion, 11/22/24, at 1 n.1.

In the interim, the trial court initially amended the temporary protective order "to allow Father one hour per week of professionally supervised contact with the Child." Trial Court Opinion, 11/22/24, at 2. Subsequently, on August 6, 2024, the trial court granted Father's requests for additional visitation time, as well as the removal of the supervision requirement. In support, Father had cited: (1) a report "for the first [supervised visit, which] described positive interaction between [him] and the Child, but [noted] the visits [were] inconsistent as they [were often] cancelled by Mother at the last minute;" and (2) CYS's conclusion that the allegations against him were unfounded. *Id*. at 2-3.

The trial court conducted hearings on Mother's PFA petition on August 27 and September 4, 2024. Mother called Officer Solari, who conducted the welfare check on the Child. He testified to all of the following: Mother told him she "received concerning text messages from the Child regarding Father's behavior." *Id*. at 4. The Child's

---

[4] Mother had also filed contempt petitions against two other fathers in her custody matters concerning other children. *See* N.T., 9/4/24, at 26. The trial court similarly consolidated those hearings. *See* Trial Court Opinion, 11/22/24, at 1 n.1.

demeanor seemed normal[,] although she became a little emotional when [asked] what was going on with her father. [Officer Solari] stated on cross-examination that **the Child did not say that Father had hit her** that night, and that the Child appeared safe at [that] time . . . and had no visible marks, bruises or scratches.

*Id*. at 4 (emphasis added and record citations omitted).

Next, Mother called another police officer to testify about an alleged open criminal investigation against Father. This officer denied the investigation was about Father "*per se*," explaining the police department was "still trying to figure out exactly what's going on." Trial Court Opinion, 11/22/24, at 5. Furthermore, this officer acknowledged there were prior investigations of Father, but all were closed without any action or charges against him.

Mother also called several representatives of CYS, who generally testified: (1) that same year, there had been ten general protective services ("GPS") cases involving the Child, the most recent filed the day before the hearing: (2) a second case was nearing the sixty-day deadline for CYS to investigate "and it's going to close;" and (3) all the other cases "had been deemed unfounded." *Id*. at 6.

Finally, Child, who was almost eleven years old at the time of the hearing, participated in

a colloquy with the [trial] court [and] indicated that she understood the difference between truth and falsehood. There were no questions from . . . either party as to her ability or competency to testify. . . .

The Child testified [to all of the following. Around] Valentine's Day, she [got] in trouble at school[,] Father got mad and hit her in the face "three or four times, . . . open and close-handed," and . . . she had a "tiny . . . red mark up by [her] hairline." Photographs were offered into evidence showing what the Child described as a "red mark on [her] cheekbone," . . . where Father hit her. . . . Father had [also] hit her on multiple occasions on her back, . . . legs, and . . . face.

[The Child] also testified about the events leading . . . to the welfare check [on] April 25[, 2024:] after a representative of [CYS spoke] to her at school, Father received a call from the school and became angry when she would not tell him what she had said. . . . Father walked off and she hid in her closet and texted Mother to call the police "because [she] was really scared that something was going to happen to her." The Child also testified that she had been touched inappropriately, but not by Father.

* * * *

The Child . . . told her teacher, her counselor, and CYS that Father hit her. [S]he also told the police officer [at] the welfare check that Father hit her[. The Child stated] the officer . . . lied if he testified that he did not recall her telling him that. Notably, the Child did not testify that Father ever threatened to burn down the house or kill anyone as claimed by Mother.

Trial Court Opinion, 11/22/24, at 7-8 (paragraph break added and footnotes and record citations omitted).

Father testified. He

conceded occasionally using corporal punishment in the form of hitting the Child on the butt. Father stated that the Child was not previously fearful of him. He . . . had concerns about the Child being unduly influenced by Mother, and . . . believed [she] would lie for Mother.

*Id*. at 10 (record citations omitted). Father also acknowledged "being upset with the Child on April 25, 2024, before the welfare check, because [she] ignored him after . . . school." *Id*. However, "[t]hroughout his testimony, he

- 5 -

consistently denied the allegations that he had struck or threatened the Child."

*Id*.

Relevantly, we note that Mother was scheduled to testify on the second day of the hearing, September 4, 2024. Mother failed to appear at the scheduled time, although her counsel advised the trial court that she "was on [her] way." N.T., 9/4/24, at 19. To accommodate Mother, the trial court heard Father's testimony first, out of the usual order, and subsequently took a short recess. *See id*. at 7, 22-23. When Mother still had not appeared, the trial court asked for an offer of proof, and her attorney explained the anticipated testimony of Mother's testimony. The trial court determined this testimony would either be hearsay or cumulative of the testimony already given by the Child. Ultimately, the trial court ruled on Mother's PFA petition — dismissing it — without her appearance. The court specifically found the Child's testimony was not credible and Father's testimony was credible. The court then proceeded immediately to the custody contempt hearings, and Mother appeared shortly thereafter.

Mother's counseled appellate brief presents four issues for our review:

1. Did the trial court err when it modified Father's contact with the [C]hild from supervised visits to unsupervised visits prior to the [PFA] hearing without any evidence other than Father's and his counsel's averments to the court?

2. Did the trial court err when it commenced the [PFA] hearing without Mother's . . . presence and thus preventing her from testifying, even though the court knew she was on her way through her counsel?

3. Was the trial court's decision against the weight of the evidence when originally having believed the [C]hild to grant a temporary [PFA order] and then after Father's brief testimony claiming the [C]hild was not credible and Father was?

4. Did the trial court err in its decisions and thus in opposition to the newly enacted Kayden's Law 23 Pa.C.S. 5300, while the parties have a pending custody matter before the court and the trial court being the Judge for both matters?

Mother's Brief at 1-2.[5]

In her first issue, Mother argues the trial court erred when it modified Father's contact with the Child, from supervised to unsupervised visits, before the final PFA hearing, "without any evidence other than Father's and his counsel's averments to the court." Mother's Brief at 1-2 (unnecessary capitalization omitted). Mother contends the court improperly modified the contact without: (1) consulting the Child; (2) considering that the Child was in therapy with the YWCA; or (3) ordering Father to obtain a psychological evaluation or participate in therapy. Mother claims Father merely stated that the CYS reports were unfounded, but introduced no evidence to support his claim. We determine Mother has waived this issue.

Pennsylvania Rule of Appellate Procedure 2119(a) provides that an appellant's argument must be "followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P 2119(a). "When an appellant fails to properly raise and develop issues in briefs with arguments that are

_____

[5] Father has not filed a brief.

sufficiently developed for our review, we may dismiss the appeal or find certain issues waived." ***Kaur v. Singh***, 259 A.3d 505, 511 (Pa. Super. 2021) (*citing* Pa.R.A.P. 2101 (stating that substantial defects in appellant's brief may result in dismissal of appeal)). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007).

Here, the entirety of Mother's argument spans one and a half pages. ***See*** Mother's Brief at 6-7. Mother provides no citations to pertinent legal authority concerning child custody generally or custody disputes in PFA matters. Mother has failed to develop her argument, and accordingly, she has waived this issue. ***See Kaur***, 273 A.3d at 511.

In her second issue, Mother argues the trial court erred when it commenced the second day of the final PFA hearing without her presence. She further asserts that the trial court prevented her from testifying. Mother contends the Child "had a breakdown" and was late to school, but her counsel had informed the court that Mother "was on her way." Mother's Brief at 9. Mother further claims that while in the security line at the courthouse, she informed police officers of Father's presence in her courtroom, as well as his outstanding arrest warrant for "PFA contempt issues," and the officers made

"her wait to give more information."[6]  ***Id.***  Mother explains "[t]his caused [her] to be late to the PFA hearing" and to arrive after the trial court dismissed her PFA petition without her testimony.  ***Id.***  We note Mother's discussion is devoid of any legal authority.

Pennsylvania Rule of Appellate Procedure 302(a) provides that issues not raised in the trial court "are waived and cannot be raised for the first time on appeal."  Pa.R.A.P 302(a).  We determine Mother has waived this issue, for failure to raise it before the trial court.  ***See id***.  At no point in the record did Mother's counsel object to the trial court closing the testimony without Mother's presence.  Indeed, Mother's counsel stated, "If you want to close the testimony, that would be your call, Your Honor."  N.T., 9/4/24, at 22.  Additionally, Mother waived her claim for failure to cite and discuss relevant authority in her appellate brief.  ***See*** Pa.R.A.P. 2119(a) (requiring argument to include "such discussion and citation of authorities as are deemed pertinent").

---

[6] Mother ignores the trial court's discussion of this claim.  The court explained that ***after*** it dismissed the PFA petition, Mother's attorney stated that Mother had arrived at the courthouse, but she was at the Sheriff's Department.  When Mother ultimately appeared in court, she claimed that her attorney directed her to go there first; Mother's counsel explicitly denied this.  Immediately thereafter, during the custody portion of the proceedings, Mother stated that she did not, in fact, go to the Sheriff's Department, but rather "she was 'detained' by security when she entered the courthouse and asked to wait to speak to someone after she told security that Father had a warrant for his arrest."  Trial Court Opinion, 11/22/24, at 11-12.

Furthermore, even if Mother had not waived the issue, we would determine no relief is due. The trial court maintained it was "unaware of any authority requiring it to have waited for [Mother's] arrival," but "[r]egardless, courts are universally acknowledged to have the power to impose silence, respect, and decorum[,] and submission to their lawful mandates." Trial Court Opinion, 11/22/24, at 17. The trial court explained that "[i]t is settled practice that a trial court may dismiss a PFA petition without prejudice when a plaintiff fails to appear for a scheduled adversarial hearing." *Id*; *see also Moyer v. Shaffer*, 305 A.3d 1064, 1068 (Pa. Super. 2023). The trial court reasoned that Mother was aware of the time and place of the hearing, her attorney was at the hearing, yet she "chose not to appear on time or to notify the court in a timely way of the reason for her tardiness." Trial Court Opinion, 11/22/24, at 16. The court explained: "The only information [it] had at the time was the representation of Mother's attorney that she was 'on her way,' but [the] attorney could not say why she was late or where she was." *Id*. Additionally, Mother ignores that the trial court attempted to accommodate her lateness, by hearing Father's testimony out of order to allow more time for her to arrive, and thereafter still taking a short recess.

Mother also ignores the trial court's discussion that her anticipated testimony "would have added nothing and would not have tipped the balance in her favor." *Id.* at 17. Mother's counsel represented to the trial court that Mother would testify about: (1) what the police officers told her, which the

trial court determined would be hearsay; and (2) the events leading to Mother's requesting the welfare check, which the trial court determined would have been "repetitive of what the Child already testified to." *Id.* at 16. Mother would have also testified that the Child was upset and did not go home with Father after the karate incident, but Father's counsel "indicated that he would stipulate to that point." *Id.* On appeal, she does not explain what testimony she would have given nor how it would have affected the trial court's decision. Thus, Mother fails to present any discussion why the trial court's conduct was in error. *See Hardy*, 918 A.2d at 771 (stating this Court will not develop arguments on behalf of an appellant). Accordingly, we determine no relief is due on Mother's second issue.

In her third issue, Mother argues the trial court's decision to dismiss the PFA petition was against the weight of the evidence. She maintains that the same trial judge initially believed the Child when granting the temporary PFA order. Mother asserts the Child testified to many specific facts regarding the alleged physical and verbal abuse, including that: (1) Father hit her three to four times across the face; (2) Father hit the family dog with a flashlight in front of her; (3) she felt unsafe around Father; and (4) she felt uncomfortable around Father's friends. Mother claims Father "produced no evidence rebutting the [C]hild's claim." Mother's Brief at 12. Mother argues that while Father testified he did not hit the Child, the Child testified about two photographs showing redness on her face the day after Father hit her. Finally,

Mother asserts that while previous CYS reports were unfounded, CYS had open reports at the time of the hearing, involving Father and Father's friends. We determine Mother has waived this issue.

Here, Mother raised a challenge to the weight of the evidence for the first time in her Pa.R.A.P. 1925(b) statement. She did not raise this challenge at any point during the hearing. Mother failed to preserve the issue, and accordingly, she has waived this issue. *See* Pa.R.A.P. 302(a).

Furthermore, even if Mother had not waived the issue, we would determine that no relief is due. In the context of a PFA order, the appellate court defers to the trial court's credibility determinations. *K.B. v. Tinsley*, 208 A.3d 123, 129-30 (Pa. Super. 2019). The trial court is free to believe all, some, or none of the testimony of the witness. *Id.* at 128.

The trial court addressed Mother's weight of the evidence claim and determined it lacked merit. The trial court reasoned:

> The trial court made its ultimate determination that the Child was not credible based on its observations of the Child's body language while testifying as well as her word choice in certain answers to questions. The term "scenario[]" did not strike the court as being either common in the lexicon of ten year olds or in line with the manner in which the Child framed other answers.
>
> The court further had concerns about the inconsistencies between what was alleged in the petition, what was told to the police by both [the] Child and Mother, and what [the] Child testified to. Similarly, [it] took note of the disparity between the photographs presented into evidence and the Child's testimony about her injuries from the one incident.
>
> Additionally, the court had concerns about the Child's assertion that she did not trust her own [guardian *ad litem*

- 12 -

("GAL")] because the GAL lied and that the police officer would have lied in his testimony regarding the interactions [during the welfare check]. Despite the Child's assertions, it struck the court as unlikely that any of the police officers would have lied in their testimony . . . or that the GAL would have lied in the performance of her duties.

Trial Court Opinion, 11/22/24, at 14 (paragraph break added).

Upon our review, we would defer to the trial court's findings of credibility. The trial court specifically found Father and the officers were credible, and the Child was not credible. The trial court was free to believe all, some, or none of the testimony of the witnesses before it. *See K.B.*, 208 A.3d at 128. Accordingly, we determine no relief is due on Mother's third issue.

Finally, Mother argues the trial court's decision to dismiss the PFA was in opposition to "Kayden's Law," 23 Pa.C.S.A. § 5328(a),[7] "while the parties have a pending custody matter before the court and the trial court being the judge for both matters." Mother's Brief. at 2 (unnecessary capitalization omitted). Mother contends that in a PFA order, victims need only to be in reasonable fear of serious bodily injury, and what a child would reasonably fear is different from what an adult facing the same threat would fear. Mother asserts Kayden's Law emerged in response to concerns about child protection in custody disputes. Mother maintains Kayden's Law represents "an unwavering commitment to protecting children . . . who deserve a safe and

---

[7] *See* 23 Pa.C.S.A. § 5328 ("Factors to consider when awarding custody").

nurturing environment." *Id.* at 17. Mother claims the trial court failed to keep the Child safe when it: (1) granted unsupervised visitation without speaking to the Child; (2) dismissed the PFA petition after the Child testified about her fear of Father; and (3) dismissed the PFA petition after the Child testified about Father's animal cruelty.

We determine Mother waived this issue due to her failure to raise it before the trial court. *See* Pa.R.A.P. 302(a). At no time before the trial court did Mother object to the dismissal of the PFA petition on the ground it would violate Kayden's Law. Thus, she has failed to preserve it for our review.

As we determine no relief is due on any of Mother's issues, we affirm the order dismissing the petition for a final PFA petition.

Order affirmed.

President Judge Lazarus joins.

Judge Bowes concurs in result.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/22/2025

- 14 -